The **SCHIAVONE–CHASE CORPORA-TION** and the **Schiavone-Chase Corporation, Lehmann Distributors, Whiting & Pike, Ltd., PTR (a joint venture)**

v.

The **UNITED STATES.**

No. 100–72.

United States Court of Claims.

April 20, 1977.

Monroe E. Freeman, Washington, D. C., for plaintiffs. F. Trowbridge vom Baur, Washington, D. C., attorney of record. vom Baur, Coburn, Simmons & Turtle, Washington, D. C., of counsel.

Bernard M. Brodsky, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant.

Before SKELTON, NICHOLS and BENNETT, Judges.

## OPINION

NICHOLS, Judge.

This case concerning a series of contracts for the reclamation of scrap metal in Vietnam comes before the court on plaintiffs' exceptions to the findings and the decision of the trial judge.* Plaintiffs allege two breaches of contract by the Government, first, the Government's failure to secure expeditiously the clearance through Vietnamese customs for certain heavy equipment plaintiffs imported into Vietnam and for certain equipment purchased from the Government, all to be devoted to performance of the contract; and second, the Government's refusal to permit plaintiffs to remove some of the scrap allegedly covered by one of the contracts. In addition to its defenses to these allegations, the Government asserted before the trial judge three counterclaims seeking reimbursement of the cost of certain lubricants and other supplies furnished plaintiffs in connection with the contracts. The trial judge held for the Government on all counts, including the counterclaims. For the reasons we shall explain, we disagree with the trial judge's

conclusions on plaintiffs' first breach theory, although we adopt the trial judge's conclusions on the second theory and the counterclaims. Inasmuch as we hold that the Government did breach the contract, we remand for the trial judge's determination of damages, which when computed may be offset against the amount already found due the Government on its counterclaims.

Plaintiffs are three corporations which separately and in combination contracted to reclaim scrap metals in Vietnam in 1968–70. During 1968 and 1969, plaintiffs as joint venturers entered into two contracts to purchase and to remove the scrap generated by the United States Army at its bases at Da Nang and Cam Ranh Bay; earlier, one of the corporate joint venturers had entered into a similar contract separately, covering scrap generated at Chu Lai. Each contract contained a clause stating:

> * * * IMPORTATION OF EQUIPMENT. The Purchaser will be granted temporary permission to import equipment into Vietnam on a tax free basis to perform on this contract. * * *

Plaintiffs agreed to remove the equipment from Vietnam on completing the contract, or otherwise to conform to requirements of the law.

The trial judge understood this to mean, in essence, that the Government would obtain or already had obtained the right to import "tax" free under Vietnamese law, as a matter of substance, but that the contractors had to conform to all paperwork and other procedural requirements the Vietnamese authorities might reasonably require. Plaintiffs seem to construe it as a commitment to facilitate importations by effecting the necessary paperwork, in addition to obtaining the abstract right. As will appear, defendant did in fact assume the burden of facilitation in procedural matters to a large extent, leaving plaintiffs to carry the papers from desk to desk, which belatedly they did. Thus the practi-

---

* The court acknowledges the able assistance rendered by Senior Trial Judge Mastin G. White in his recommended opinion and findings in this case. We reach a different result from his, on some issues.

cal construction of the contract, during performance, was largely agreed on both sides.

Vietnam was a third world country that, before the recent war, would have needed only an unsophisticated customs service. Anyone proposing to obtain duty-free temporary import privileges would have anticipated procedural difficulties that might have made a substantive right of little value. Even in this country, with its long tradition of law-abiding and sophisticated customs practice, and with a statute or published regulation for every contingency, procedures may and often in the past have stifled substantive rights. The General Agreement on Tariffs and Trade (GATT, TD 51802) in its procedural clauses constituted a recognition that this was universally true and required worldwide attention to the discovery of remedies. The Customs Cooperation Council, that sits in Brussels, exists in large part to further the same ends.

■ We do not think any contractor would have accepted the IMPORTATION OF EQUIPMENT clause as adequate, if it meant only that substantively, he enjoyed temporary duty-free rights, subject to such procedural obstacles as the Vietnamese customs might devise. He would have accepted it only if he supposed that he could count on the United States Embassy, or other United States officials, to operate effectively to remove any such obstacles he might encounter in course of conforming to the usual paper routine. His obligation would be to furnish complete and truthful information to identify the equipment to be imported, and to safeguard it after importation to be sure it did not pass into the Vietnamese economy without payment of required duties. If he played his part, and obstacles still seemed insuperable, he would expect defendant to use the influence that, from the attendant circumstances of the war, he might suppose it to have. If the obstacles remained in place, it would be *res ipsa loquitur*, in his eyes, that defendant was not performing its promise. If defendant intended less, it should, in writing the contract, have spelled out the limitations on

its commitment in greater detail. In view of the conflicting understanding of the provision manifestly it is ambiguous in its context, and defendant's interpretation must yield under the doctrine of *contra proferentem*. It is to be presumed that defendant hoped that scrap bidders would not make deductions from their bids to hedge against the possibility that they would have trouble importing equipment. Defendant knew the Vietnamese customs service; plaintiffs did not.

Plaintiffs contend that the Government breached this promise twice, once with respect to a crane and pickup truck that plaintiffs shipped from Manila, and later with respect to several items purchased by plaintiffs from the Government in Vietnam, the so-called "IFB equipment." We shall address each separately, as the trial judge did.

*The Crane and the Pickup Truck*

Plaintiffs first attempted to import a crane and pickup truck, which landed at Da Nang on May 7, 1969. Vietnamese customs officials immediately impounded the shipment and refused to clear it for want of an application for importation complete with the serial numbers identifying each piece of machinery. Over the next 2 weeks, plaintiffs secured the United States Embassy's approval of their importation request, even though plaintiffs' documents still lacked the serial numbers demanded by the customs bureau and described the crane with an incorrect model number. In any event, it appears that plaintiffs submitted their application by the end of May. The trial judge observed that customs clearance generally awaited "2 weeks to 2 months" from the time that properly prepared documents were presented to Vietnamese customs officials. Even so, plaintiffs waited for permission to import this equipment without "tax" until November 11, 1969. Plaintiffs contend that their difficulties in obtaining import privileges for this equipment needed to compress the bulky scrap for transportation to the dock constitutes the Government's breach of the warranty of tax-free importation contained in the importation clause.

From the testimony of record, it appears that the United States Embassy officials in Saigon believed that Vietnamese customs law waived duties on equipment imported by Government contractors when necessary for the performance of their contracts. The Embassy developed procedures to assist such contractors in registering for Government contractor status, which the Embassy would certify to Vietnamese officials on the contractor's behalf once the contracts were executed. Later, when the contractors prepared to receive a specific shipment, the Embassy would further certify that the goods at dockside were, in fact, necessary for contract performance. The Embassy apparently contemplated that a shipment of Embassy-approved goods consigned to an Embassy-certified contractor would be, automatically, admitted into the country tax-free. One Government witness described the arrangement as one in which Vietnamese customs officials sought to manage the great volume of contractor requests submitted from United States contractors during this time by delegating to the United States Embassy its authority to screen its contractors' eligibility for tax exemptions.

This was not the view of plaintiffs' Vietnamese counsel, however. Citing the Vietnamese language letters of transmittal that accompanied United States Embassy contractor certifications through the Vietnamese foreign affairs ministry to the customs bureau, counsel expressed her understanding that the customs bureau retained discretion to approve or deny contractor applications for importation, regardless of the Embassy's position in the matter. Furthermore, counsel expressed her doubt that scrap metal purchasers such as plaintiffs would be regarded as qualified for importation privileges, which were extended only to contractors engaged in military or economic aid projects.

If we could determine that plaintiffs had no substantive import privileges under Vietnamese law, it would then follow directly that the Government extended in the importation clause a promise that it did not keep because it could not. This alone would establish the Government's breach. But because of the peculiar setting of this controversy, we are unable to determine what was the relevant customs law in wartime Vietnam. Upon consideration of both oral argument and the written record, we conclude, frankly, that the state of the law may now be indeterminable, for it existed less in statute or case law as in imprecise regulations, unspoken diplomatic protocols and unreported views of Vietnamese officials. Impeded as we are in finding the law, as a matter of law, we can proceed upon the assumption, as a matter of fact, that plaintiffs' substantive rights did exist. As shown above, defendant would no less have failed to deliver upon its promise of tax-free importation, if substantive rights were provided but if the contractor was effectively denied the exercise of its rights. This was the situation as we see it.

█ It is fair to assume that Embassy officials believed themselves able to exert great influence upon the Vietnamese, and to extract bureaucratic concessions where deemed necessary. Perhaps their confidence surpassed their abilities to achieve results. Or, perhaps placed in the larger context of events then occurring in Vietnam, the tax-free importation of scrap-reclaiming machinery did not seem to warrant a high priority. Whatever the reason, the Government failed to perform its promise, which constitutes its breach.

The Government's contention, in response, that plaintiffs' difficulties in importing its equipment were originally of their own making is, even if true, inadequate. The trial judge found that plaintiffs' clearance documents were incomplete at the time the equipment landed at Da Nang, although he seemed to imply that they were complete by the end of May. Customs officials, nevertheless, withheld their clearance for 6 months longer, until November. The Government does not attempt any explanation for the remainder of the delay. Nor does the trial judge expand upon his finding that at least a part of the overall delay was plaintiffs' fault. While we do not quarrel directly with this finding,

we maintain the view that so much of the delay not directly attributable to deficiencies of plaintiffs' importation application, was the Government's responsibility. We presume, without deciding, that this period runs from the time plaintiffs furnished sufficient applications until the time the equipment was cleared from port. The measure of plaintiffs' damages shall be the cost of this additional delay. It is appropriate now to remand for definite findings upon which to compute damages.

### The IFB Equipment

Before May 1969, plaintiffs had purchased from the Government vehicles and assorted other surplus machinery already in Vietnam, called in this case "IFB equipment." The Vietnamese customs bureau rigorously restricted a contractor's use of vehicles that were admitted tax-free to Vietnam to operations necessary in performing its contracts. In order to control their use, Vietnamese customs designated these vehicles with specially coded license plates, without which they could not be used on the public roadways except to be exported from the country. In May, United States Embassy personnel assisted plaintiffs in obtaining the special plates on a temporary basis until early October when customs officials refused to extend further interim permission. According to the trial judge, Vietnamese customs officials expected that plaintiffs would use their IFB equipment only until they could obtain substitute equipment from outside Vietnam and the authorization to use that equipment permanently. After October, customs officials did not respond to plaintiffs' further requests concerning the vehicles or other items in the IFB category, or to Embassy requests on plaintiffs' behalf. Plaintiffs enjoyed no further use of this equipment in Vietnam. Eventually, they exported their IFB equipment and borrowed Government equipment as it was available intermittently, as a partial substitute for use in scrap reclamation.

■ Here, as they did on their first count, plaintiffs assert their frustrated efforts to press the equipment into service as the Government's breach of the importation clause. Again we agree, and our confidence in this conclusion is enlarged as we notice that the Government's defense rests completely on a rather extreme position. The Government's sole argument is that the term "importation" in this contract's lexicon pertains only to items brought by the contractor into geographical Vietnam from outside its political borders. Thus, as the Government persuaded the trial judge, the clause would not govern the IFB equipment which was already located within Vietnam and purchased there. The trial judge goes so far as to admit that plaintiffs could have invoked the clause by shipping their IFB equipment from Vietnam to the Philippines for example, and then returning it to Vietnam under the duty-free privilege extended Government contractors. We think this goes too far. We cannot conceive that such a wasteful endeavor might have been the intent either of a contractor, who would bear the expense, or of the Government, eager to relieve itself of a seemingly infinite glut of scrap. The more tangible flaw in the Government's analysis flows from its efforts to attach to "import" a geographical meaning.

■ The word "import" is, of course, somewhat of a term of art in tariff law. In general, it means what the Government says it means and therefore, does not apply to a shift in customs status of merchandise previously brought within a nation's territorial boundaries. Thus, we say, "imported or withdrawn from warehouse for consumption," in the disjunctive. It was imported; it was warehoused; it was withdrawn from warehouse, but it was not imported on the latter occasion even though it was then that the import duties were paid. But it can have a variable meaning dependent on context. Thus in *Procter & Gamble Mfg. Co. v. United States,* 19 C.C.P.A. (Customs) 415, *cert. denied,* 287 U.S. 629, 53 S.Ct. 82, 77 L.Ed. 546 (1932), merchandise produced on the high seas, whale oil, was held imported, because the context of the act assessing duties on fishery products required that

construction, though the statutory definition would have required it to be brought from a foreign country. We think the context likewise requires here that the word "import" should include purchase within Vietnam of imported goods from another temporary importer. In *Procter & Gamble, supra,* at 422, the court said:

It is quite often found necessary, in construing provisions in tariff acts to conclude that a certain term has varying meanings, according to its uses and context. An example is the word "import." This term may mean to bring goods within the jurisdictional limits of the country. [Citing cases]; or it may mean the time when it is withdrawn from warehouse and enters the commerce of the country. [Citing cases.]

■ It may be noted that the IMPORTATION OF EQUIPMENT clause was, obviously, inartfully drafted by one not familiar with tariff terminology. It refers to importing "on a tax-free basis." Properly, exactions incident to the importation of merchandise are called "duties," not taxes. Defendant might well argue that Vietnamese customs duties were not "taxes" and so not within the warranty. Such an argument would be quite in line with the one actually made concerning the meaning of the word "import."

By controlling imports and exports of tangible goods, along with currencies, the Vietnamese government sought to insulate its domestic economy, as best it could, from intolerable inflation and rampant black marketeering. Exemption from economic regulation was provided where deemed necessary to further the military campaign, however, for such activities were considered apart from the Vietnamese local economy. Similarly, purchases of United States Government-owned property were regarded as separate, and were relatively unregulated like other non-Vietnamese commerce. Meanwhile, the indigenous Vietnamese economy was thoroughly regulated by a complex system of controls. Thus, a two-tiered economy was permitted to develop. The customs law was one mechanism, in our understanding, that kept the two tiers apart.

The law was comparatively unconcerned with transactions that were not within the domestic economy, purchases or sales between foreign nationals paid for in foreign currency, for example. These might be considered "imports" in one sense, if the merchandise entered the country from another. But that was not the distinction operable in Vietnamese law. Rather, an import was a transaction that caused merchandise to enter the Vietnamese economy, regardless of when it entered the country. Thus, a customs "tax" was due upon goods when entering the Vietnamese economy, even though the goods themselves might have been in Vietnam for some time, may have moved physically only between two Vietnamese towns, or across town. Regardless of geography, the duty would be imposed unless the parties to the transaction could establish that their business, contrary to first appearances, was still outside the local economy. These exceptional transactions, temporarily excused from taxes otherwise imposed, were the "tax-free imports" to which the importation clause applied.

A particular purchaser's ability to qualify for "tax" exemption appears to have depended on his own identity and his purpose for doing business in Vietnam. The question involves the same substantive issues that we found ourselves unable to resolve in connection with plaintiffs' crane and pickup truck. Suffice it to say, though, that we find the Government in the same position here with respect to the IFB equipment, having assured plaintiffs of tax-free import privileges that did not materialize. We sustain plaintiffs' allegation of the Government's breach of contract.

■ Once again, a word regarding damages might be of useful guidance to the trial judge on remand. Plaintiffs should recover on this count the losses and expenses they incurred from their inability to use the IFB equipment in furtherance of the contract. Plaintiffs, however, seek further damages, related to their decision in

May and June 1969 not to import from the United States certain other items of heavy equipment. The trial judge determined that plaintiffs based their decision on their difficulties with the IFB equipment. We think the situations were different, and one should not have influenced a decision on the other. Difficulties surrounding the importation of IFB equipment were not the same that plagued the importation of the crane and pickup truck, which was a situation more akin to that involved in bringing equipment from the United States. By July 1969, moreover, plaintiffs anticipated no further delays in such imports from other countries. Therefore, we conclude that plaintiffs are not entitled to compensation arising from their own choice to postpone imports of additional equipment.

### The Chu Lai Contract

This claim, based on the allegation that plaintiffs were entitled to remove larger quantities of scrap from Chu Lai than the Government delivered, involves only one of the contracts undertaken by the joint venture. The contract was negotiated for plaintiffs by one of the joint venturers, The Schiavone-Chase Corporation (SCC).

On November 7, 1968, SCC wrote to the contracting officer to express its interest in salvaging and removing from Vietnam "all scrap and salvageable material located in Chulai at the present time including the generation for the next two years with the option of one more year." On December 17, the contracting officer informed plaintiff that its offer for a two-year term contract for the property located in the Chu Lai area had been accepted. The contracting officer further advised that "minor details * * will be worked out by the time the contract is prepared." Thereafter, SCC received a formal proposal containing provisions for the negotiated sale of scrap at Chu Lai. The proposal included estimated quantities of various categories of scrap that the Government would sell and the plaintiff agreed to buy. These estimates, determined after plaintiff's and defendant's representatives toured the scene at Chu Lai,

were acceptable to both parties. On January 28, 1969, SCC and defendant executed the standard form contract entitled "Sale of Government Property, Bid and Award," to which the contracting officer attached a separate form incorporating, with few revisions, the estimated quantities previously agreed upon as the amount of scrap to be covered by the contract. The purpose of this formal advice was to notify the contractor that it had been awarded the contract, and to furnish a description of the subject matter of the award.

The contract also contained the following provisions:

*ARTICLE AM—TERMINATION.* This contract will cover the period shown in the item description both dates inclusive unless sooner completed, or terminated by either party upon thirty days' written notice to the other, to be calculated from the date the notice is mailed.

\* \* \* \* \* \*

ARTICLE AO—ADJUSTMENT FOR VARIATION IN QUANTITY OR WEIGHT. * * * When property is sold on a "unit price" basis, the Government reserves the right to vary the quantity or weight delivered by 50% from the quantity or weight listed in the Invitation; and the Purchaser agrees to accept delivery of any quantity or weight within these limits. The Purchase price will be adjusted upwards or downwards in accordance with the unit price and on the basis of the quantity or weight actually delivered.

Plaintiffs promptly began to prepare a base and hire personnel at Chu Lai, but large-scale processing and shipment of material out of Chu Lai could not begin because the port there was closed by Vietnamese authorities until July 1, 1969. Plaintiffs began full-scale operations under the contract on July 15. Operations were continued there until May 21, 1970, when defendant terminated the Chu Lai contract by a formal notice dated April 20, 1970.

By the time the Chu Lai contract was terminated, defendant had delivered to plaintiffs quantities of scrap that exceeded

the estimated amount in each major category. At trial, plaintiffs' witnesses testified that there was, nevertheless, additional scrap at Chu Lai at that time, which the Government refused to deliver. Plaintiffs now contend that they were entitled to buy these quantities under the Chu Lai contract, even though in every category the quantity of scrap then on hand, when added to quantities previously delivered, would have exceeded the estimated quantities originally agreed upon. Plaintiffs base their contention upon the general agreement that was reached in the exchange of correspondence dated November 7 and December 17, 1968, that SCC would purchase all scrap then located in Chu Lai plus the scrap generated there in the next 2 years. Plaintiffs deny that this general agreement was affected either by the joint estimates of quantities that accompanied the written contract, or by the contract term that reserved to the Government the right to vary quantities.

■ The trial judge reasoned correctly, in rejecting plaintiffs' arguments, that the contract and the estimates superseded the general agreement represented by the original correspondence. Accordingly, defendant did not breach the Chu Lai contract by declining to permit plaintiffs to purchase and remove the quantities of scrap that may have been on hand when the contract was terminated.

The trial judge further found that there was a substantial conflict in the evidence presented by the parties concerning the amounts of different types of scrap that actually were on hand at Chu Lai in May 1970. When such conflicts are carefully evaluated, it must be concluded that plaintiffs have failed to sustain their burden to establish that they were entitled to take delivery of additional quantities of scrap.

### The Counterclaims

Defendant's three counterclaims concern petroleum products and industrial gases that defendant allegedly supplied plaintiffs on a reimbursable basis, but for which plaintiffs failed to pay. Defendant substantiates its counterclaims with computer billing lists contained in its own books and records, and with a defense witness' testimony that these computer billing lists were prepared from original "hard copy" documents that were signed by plaintiffs' authorized representative each time supply items were furnished to the joint venture.

When plaintiffs sought to audit defendant's books and records in connection with these counterclaims, they discovered that most of the original supporting documents had been destroyed, pursuant to the Army's policy in Vietnam of discarding such papers after 2 years. Inasmuch as most of the computer lists are not supported by any original documentation now in existence, plaintiffs contend that the counterclaims should be dismissed for lack of proof.

■ In view of the circumstance that the computer lists constitute the best evidence that is available now, however, as well as the fact that plaintiffs did not present any conflicting evidence, it was the trial judge's opinion that the interests of justice would be served by accepting the computer lists as establishing the validity of defendant's counterclaims. Since we agree, defendant is entitled to a judgment against plaintiffs in the amount of $231,331.83, together with interest at the rate of 6 percent per annum from the respective dates of the several billings to the time of payment.

■ In connection with the interest issue, Article L of each contract provided that, unless paid within 30 days from the date of first written demand, all amounts due the Government from plaintiffs would accrue interest at 6 percent per annum from the date of first demand until paid. Each contract, as modified, contained a provision for the Government's furnishing plaintiffs logistical support on a reimbursable basis, such as the supplies subject of the counterclaims. Thus, the interest clause is properly invoked.

After due consideration, we conclude that plaintiffs' exceptions to the trial judge's findings, do not warrant that those findings be disturbed. Therefore, the court adopts those findings as its own, making them

available to the parties, although they are not reprinted.

## CONCLUSION OF LAW

Accordingly, the court determines that plaintiffs are entitled to recover on their principal claims to the extent indicated in the opinion. Defendant is entitled to recover on its counterclaims. The case is remanded to the Trial Division for further proceedings consistent with this opinion and Rule 131(c), to determine the net amount owing to plaintiffs or defendant, to be awarded in the final judgment of the court.